**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**


City Discovery, Inc.,                                              Case No. 3:17CV1515

                  Plaintiff

           v.                                              **ORDER**

Northaven Development Group, LLC, *et al.*,

                  Defendants


This is a contract dispute. Plaintiff City Discovery, Inc. claims that defendant Joseph T.

Nachtrab wrongfully commingled City Discovery's money, which it gave Nachtrab to invest,

with his personal account, which his bank liquidated after the 2008 financial crisis.

City Discovery, which is French-owned City Discovery SAS's U.S. subsidiary, engaged

defendant Northaven Development Group, LLC (NDG), through NDG President Nachtrab, to

assist with its the U.S. business.

Throughout this relationship, City Discovery asked Nachtrab to invest some of its money.

Relevant to this dispute, City Discovery gave Nachtrab $215,000, which he, pursuant to his and

City Discovery's existing investment arrangement, placed in a certificate of deposit (CD) in his

personal PNC Bank account. Nachtrab's line of credit at PNC listed his personal stock account as

collateral. Accordingly, in the wake of the 2008 financial crisis, PNC seized the CD to satisfy the

line of credit.

City Discovery raises claims against NDG and Nachtrab for conversion, civil theft,

fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation, breach of

fiduciary duty, unjust enrichment, and negligent hiring, supervision, and retention. City

Discovery also brings a breach of contract claim solely against NDG.

Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a).

Pending is City Discovery's partial motion for summary judgment (Doc. 18) as to its

negligent misrepresentation and breach of fiduciary duties claims against both defendants and its

conversion, breach of contract,[1] and unjust enrichment claims against Nachtrab. Defendants

argue that a release bars these claims. (Doc. 21).

For the reasons that follow, I deny the motion.

## Background

City Discovery and its French parent, City Discovery SAS (CDSAS), provided tourism

booking services worldwide until CDSAS's February, 2016 acquisition. NDG, a holding

company that Nachtrab and his family formed, "provide[s] back office support for" its portfolio

companies. (Doc. 18-2 at 37:16-25). Nachtrab, a former certified public accountant, owns a 20%

interest in NDG and is its president. NDG, in turn, is a member of Rowdy Co., LLC, which

Nachtrab owns. (Doc. 1 at 3, ¶ 9; Doc. 6 at 1, ¶ 9). At some point, Rowdy acquired an interest in

CDSAS. (Doc. 1 at 3 ¶ 9; Doc. 6 at 1, ¶ 9).

Sometime in 2006 or 2007, City Discovery CEO Emmanuel Issaurat's father, whom

Nachtrab knew, asked Nachtrab to help City Discovery with its U.S. credit card bookings. (Doc.

18-2 at 35:1-9). Nachtrab agreed, and NDG began processing such bookings. (*Id.* at 37:10-12).

At some point, NDG's services to City Discovery expanded to include other administrative and

---

[1] City Discovery seeks summary judgment on its breach of contract claim against Nachtrab. The complaint, however, lodges such a claim against NDG only. (Doc. 1 at 11, ¶¶ 65, *et seq.* (Count Eight)). City Discovery may, if it so desires, move for leave to amend the complaint to add a breach of contract claim against Nachtrab.

financial tasks, including reconciling vendor bills and facilitating "the preparation and

maint[enance] of" City Discovery's financial statements. (*Id.* at 53:23-25, 54:1).

## A. The Investment Arrangement

Issaurat regularly asked Nachtrab for advice about how to generate "earnings on the cash

that was accumulated in City Discovery." (Doc. 18-2 at 74:22-24). In response, Nachtrab offered

to "comingle some funds and jointly invest in some jumbo CDs." (*Id.* at 75:4-5). Combining City

Discovery's and Nachtrab's funds would garner a higher interest rate than separate investments.

(*Id.* at 81:8-9). When the CDs matured, Nachtrab, depending on the parties' wishes, would return

City Discovery's money or let the CDs renew.  (*Id.* at 75:20-25; 76:1-4, 79:17-21). Nachtrab

instructed NDG employee Ariel McQuillin[2] to monitor these investments. (*Id.* at 83:2-24, 112:3-

12).

The parties engaged in several transactions pursuant to this arrangement. (*Id.* at 76:15-

17).

## B. The CD at Issue

In or about 2011, City Discovery gave Nachtrab $215,000 to open the CD at issue in this

case. (Doc. 18-2 at 76:23-25, 77:1-2). In accordance with the above procedure, Nachtrab opened

the CD in his name at PNC Bank. (*Id.* at 75:7-9, 76:23-25, 77:1-2). The CD that held the

$215,000 accordingly became part of Nachtrab's portfolio account at PNC. [3] (*See id.* at 90:1-15).

Nachtrab also had a line of credit with PNC, which "was secured based on the percentage

of the value in [his] portfolio account." (*Id.* at 90:1, 8-12). In the wake of the 2008 financial

---

[2] The case record includes various spellings of Ms. McQuillin's name. For purposes of this
opinion, I adopt the spelling in City Discovery's summary judgment brief. (*See* Doc. 18-1).

[3] Throughout this opinion, I refer to the account that held the $215,000 investment as "the CD."

crisis (Nachtrab estimates between 2012 and 2014), "the bank called and said they're calling the pledge account." (*Id.* at 90:14-15, 92:1).

The bank, apparently without Nachtrab's knowledge, liquidated the CD to pay off Nachtrab's credit line. (*See id.* at 90:19-21, 92:5-12). Nachtrab submits that he did not learn that PNC liquidated the CD until the Summer of 2016. (*Id.* at 92:18-22). Accordingly, City Discovery's financial statements, which NDG helped prepare, continued to reflect the CD. (*See id.* at 92:9-12). CDSAS's eventual acquirer, Veltra, informed CDSAS about the CD's liquidation after Veltra and its accountant's due diligence inquiry, which spanned November, 2015 through February, 2016. (*Id.* at 92:12-25).

Veltra acquired CDSAS (and, thereby, City Discovery) in February, 2016. (Doc. 1 at 3, ¶ 12).

### C. The Release Agreement

Nachtrab insisted that, in connection with the CDSAS acquisition, City Discovery and CDSAS execute a release agreement. (Doc. 18-2 at 115:22-25, 116:1-9). The agreement (Doc. 21-1) releases NDG, Nachtrab, his son, and their affiliates

> from any and all claims . . . caused by or arising out of, directly or indirectly, NDG's ownership in CDSAS; any services (including, without limitation, accounting and tax reporting services) rendered by NDG, [Nachtrab, his son, or any of their affiliates] . . . for or on behalf of CDSAS [and its affiliates.]

(Doc. 21-1).

Issaurat signed the release for CDSAS, City Discovery, and himself, individually. (*Id.*).

### Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence

of a genuine issue of material fact. *Id.* at 323.

The burden then shifts to the nonmoving party to "set forth specific facts showing there is

a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56

"requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible

evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor.

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

**Discussion**

The parties dispute whether the release agreement bars City Discovery's claims.

### I. City Discovery's Claims Arose Out of NDG's and Nachtrab's Services

City Discovery argues that the release language does not apply to its claims. I disagree.

"[A] release of liability is an absolute bar to a later action on any claim encompassed

within it absent a showing of fraud, duress, or other wrongful conduct in procuring it[.]" *Lucarell*

*v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 462 (Ohio 2018). "As such, it is a contract between

parties, enforceable at law subject to the rules governing the construction of contracts." *Task v.*

*Nat'l City Bank*, 1994 WL 43883, *4 (Ohio App.) (citing *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d

411 (Ohio 1987)). "[T]he intention of the parties[,]" then, "governs in interpretation of releases."

*Whitt v. Hutchision*, 330 N.E.2d 678, 682 (Ohio 1975). "The intent of the parties . . . is presumed

to reside in the language they chose to employ in the agreement." *Kelly*, *supra*, 509 N.E.2d at

413.

City Discovery submits that its claims "w[ere] in no way caused by . . . any services NDG [or Nachtrab] provided for City Discovery." (Doc. 23 at 3).[4] Citing Nachtrab's deposition testimony, City Discovery claims that Nachtrab invested the funds at issue as part of a personal venture with City Discovery. (*Id.* at 2-3).

Nachtrab did not so clearly distinguish his and NDG's services to City Discovery, on the one hand, from a personal relationship with City Discovery, on the other:

> Q: Okay. Now, managing these certificate funds, is what I'll call them, or the missing funds, was that part of the services that NDG was supposed to be providing for City Discovery?
>
> A: That's an interesting question. I guess I don't totally understand your question.
>
> Q: You said that City Discovery was paying you on a monthly basis, correct?
>
> A: Correct.
>
> ***
>
> Q: So was the management of the $215,000 part of those monthly payments?
>
> A: Probably not. This was just something – Ariel kind of managed all of our funds. As I said before – what an interesting question that is. As I said before, we never really got paid for our time. So if you want to kind of force me to say that everything I was paid for was everything that NDG did, I suppose that's right, but to me that's not very accurate.

(Doc. 18-2 at 81:14-25, 82:1-11).

At best, Nachtrab's testimony shows that he did not know whether City Discovery's payments purported to compensate NDG for the investment arrangement. More plausibly, Nachtrab's testimony demonstrates his dissatisfaction with how much – or how little – City Discovery paid for NDG's services.

---

[4] City Discovery also argues that its claims did not arise out of NDG's ownership stake in CDSAS. (Doc. 23 at 3). NDG does not dispute this point. (*See* Doc. 25).

In its complaint, City Discovery alleges that NDG provided "general financial and accounting services[,]" which "included, among other things . . . oversight over City Discovery's bank accounts and other assets." (Doc. 1 at 3, ¶ 10).

The investment arrangement required that NDG oversee City Discovery's assets. Indeed, the $215,000 and the CD were City Discovery assets. The CD appeared on City Discovery's financial statements, which NDG helped prepare, as such. (Doc. 18-2 at 92:9-12). McQuillin, an NDG employee, "processed the movement of money for [Nachtrab], for NDG, for City Discovery." (Doc. 18-2 at 83:5-6). By City Discovery's own allegations, then, this arrangement was part of the general and financial accounting services NDG provided.

The release's broad prohibition of claims "arising out of, *directly or indirectly*, . . . any services (including, *without limitation*, accounting and tax services)" NDG and Nachtrab provided, at minimum, creates a genuine issue of material fact as to its applicability. (Doc 21 (emphasis added)). I therefore deny City Discovery's motion for summary judgment.[5]

## II. Nachtrab's Conduct Was Not Wanton

City Discovery alternatively argues that, even if the release language includes its claims, the release is inapplicable because Nachtrab acted wantonly. I disagree.

Under Ohio law, "the execution of a release . . . cannot bar claims of willful and wanton conduct." *Harsh v. Lorain Cty. Speedway, Inc.*, 675 N.E.2d 885, 888 (Ohio App. 1996). "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is

---

[5] Defendants have not cross-moved for summary judgment. I therefore need only determine whether defendants met their burden in opposing summary judgment to identify a genuine issue of material fact.

7

owed in circumstances where there is great probability that harm will result." *Anderson v.*

*Massillon*, 983 N.E.2d 266, 273 (Ohio 2012).[6]

"[A]n attempt, however meager" to minimize potential risk rebuts a claim that a

defendant acted without care and, thus, wantonly. *See Zivich v. Mentor Soccer Club, Inc.*, 1997

WL 203646, *4 (Ohio App.). In *Zivich*, *supra*, the court held that a youth soccer club president

did not act wantonly by failing to address an unanchored goal that injured a child because he

gave information from an equipment safety meeting to his successor and some park officials. *Id.*

Similarly, here, Nachtrab took some steps to minimize the investment risk to City

Discovery through his instructions to McQuillin. Nachtrab told McQuillin to supervise the CD

(and other investments made pursuant to the arrangement with City Discovery) and, upon

maturity, to "ask [Nachtrab], 'Do we want to renew or return it[?]". (Doc. 18-2 at 83:2-10, 84:5-

22). McQuillin's apparent failure to follow these instructions does not make Nachtrab's conduct

wanton. *See Zivich*, *supra*, 1997 WL 203646 at *4 (city officials' failure to heed information

former soccer club president gave them did not make former president's conduct wanton).

---

[6] Before the Ohio Supreme Court's decision in *Anderson*, *supra*, Ohio courts required that parties claiming wanton misconduct show "a disposition to perversity." 983 N.E.2d at 272 (quoting *Universal Concrete Pipe Co. v. Bassett*, 200 N.E. 843 (1936)). The court in *Anderson* noted, however, that "the court [later] abandoned 'disposition to perversity' as an element of the definition of wanton misconduct." 983 N.E.2d at 272 (citing *Hawkins v. Ivy*, 363 N.E.2d 367 (Ohio) (1977)). Yet, as one Ohio appellate court noted, "cases decided subsequent to *Hawkins* continued to include the 'disposition to perversity element when discussing wanton or reckless conduct." *Hoffman v. Gallia Cty. Sheriff's Office*, 103 N.E.3d 1, 17, n.7 (Ohio App. 2017) (collecting cases); *see also Mashburn v. Dutcher*, 14 N.E.3d 383, 391 (Ohio App. 2012) (requiring perversity to demonstrate wanton misconduct).

It is unclear, then, whether the perversity requirement still applies (though, my reading of *Anderson* indicates it does not). In any case, I need not determine whether Nachtrab had a disposition of perversity because I find that he exercised some care and the consequences of his actions were not greatly probable.

Moreover, City Discovery must show that the CD's liquidation was more than merely foreseeable. *Mashburn*, *supra*, 14 N.E. 3d at 391 (explaining spectrum of knowledge required for negligent through willful conduct). City Discovery does not identify evidence to show that Nachtrab, a former "CPA and avid investor," (Doc. 23 at 4) knew the market's collapse and the CD's resulting liquidation was greatly probable. *See Anderson*, 983 N.E.2d at 273 (announcing wantonness standard). That Nachtrab "must have known the volatile nature of the stock market in the early 2000s" (*see* Doc. 23 at 4) and, thereby, should have anticipated the market's decline shows that the CD's liquidation was, at best, foreseeable.

I therefore do not find that Nachtrab engaged in wanton conduct.

### Conclusion

It is, therefore,

ORDERED THAT

Plaintiff City Discovery, Inc.'s partial motion for summary judgment (Doc. 18) be, and the same hereby is, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge